```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
                       EASTERN DIVISION

SOUTHWESTERN BELL TELEPHONE     )
L.P., et al.                    )
                                )
          Plaintiffs,           )
                                )
     vs.                        )     No. 4:04-CV-1573 (CEJ)
                                )
GLOBAL CROSSING LTD., et al.,   )
                                )
          Defendants.           )
```

**MEMORANDUM AND ORDER**

This matter is before the Court on the motion of the Global Crossing defendants to dismiss for failure to state a claim for relief, pursuant to Fed.R.Civ.P. 12(b)(6), or, in the alternative, for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1). Plaintiffs oppose the motion and the issues are fully briefed.

For the reasons discussed below, the Court will stay this matter pursuant to the doctrine of primary jurisdiction, pending resolution by the Federal Communications Commission (FCC) regarding the obligations of the various participants in the transmission of long distance telephone calls using Internet Protocol (IP) format. In addition, the Court finds that all claims arising before December 9, 2003, are barred by operation of a bankruptcy reorganization plan entered in In re Global Crossing Ltd., No. 02-40188 (REG)(Bankr. S.D.N.Y.).

## I. Background

Plaintiffs are ten Local Exchange Carriers[1] (LECs) that provide telecommunication services in different regions of the country. Defendant Global Crossing[2] is an interexchange (IXC) carrier that provides long distance telephone service. Also named as defendants are Least Cost Routers (LCRs)[3] with whom Global Crossing contracts to deliver long distance calls, and Competitive Local Exchange Carriers (CLECs).[4] Plaintiffs allege that the defendants improperly disguise long distance phone calls as local calls in order to avoid paying access charges due under federal and

---

[1]Southwestern Bell Telephone, L.P., Pacific Bell Telephone Company, Nevada Bell Telephone Company, Michigan Bell Telephone Company, Illinois Bell Telephone Company, Indiana Bell Telephone Company, Ohio Bell Telephone Company, Wisconsin Bell, Inc., The Southern New England Bell, Inc., and Woodbury Telephone Company. These entities are all owned by non party SBC Communications, Inc.

[2]The Global Crossing defendants are: Global Crossing Limited, Old GC Ltd., Global Crossing Telecommunications, Inc., and Global Crossing North America Networks, Inc.

[3]Defendant John Does 1 through 10 are identified by plaintiffs as CLECs and LCRs. No specific LCRS are identified.

[4]The amended complaint names the following CLECs as defendants: McLeodUSA, Inc., McLeodUSA Holdings, Inc., McLeodUSA Telecommunications Services, Inc., and McLeod USA Network Services, Inc. (collectively, McLeod); NuVox, Inc., and NuVox Communications of Missouri, Inc. (collectively, NuVox); XO Communications, Inc., XO Missouri, Inc., and XO Texas, Inc. (collectively XO), Xspedius Management Co., LLC, Xspedius Holding Corp., Xspedius Communications, LLC, and Xspedius Management Co. Switched Services, LLC, (collectively, Xspedius). Plaintiffs dismissed, with prejudice, their claims against the XO defendants. Thus, the only CLECs remaining in the dispute are the McLeod defendants and the Xspedius defendants. They have separately moved to dismiss for failure to state a claim. Because the Court will stay this matter, the motion of the McLeod and Xspedius defendants will be denied without prejudice.

state tariffs. Plaintiffs assert claims for breach of federal and state tariffs, unjust enrichment, fraud, and civil conspiracy.

Plaintiff LECs operate telephone networks in different regions of the country. The defendant CLECs offer identical services in competition with the LECs. Both LECs and CLECs carry calls to and from end users (i.e., customers) within a local exchange; they also connect customers to long distance carriers at "points of presence" (POPs). Interexchange carriers pay LECs access charges -- at rates determined by federal and state tariffs -- to originate and terminate long distance calls.[5] The LECs maintain separate facilities for receiving long distance and local calls for delivery to their customers. The long distance facilities, known as "Feature Group D trunk facilities," are set up to measure long distance traffic so the LECs can bill the appropriate access charges. The local exchange facilities lack the capacity to detect and measure long distance calls.

Defendant Global Crossing is an interexchange carrier. When a Global Crossing subscriber places a long distance phone call, the LEC transfers the call to Global Crossing's POP. Plaintiffs allege that Global Crossing transfers the call to an LCR with whom it has contracted. The LCR converts the call into IP format for transmission to the POP that serves the called party's area. The call is then reconverted and transferred either directly to the LEC for delivery to the called party or to a CLEC for delivery to the

---

[5]The connections between LECs and CLECs are governed by interconnection agreements (ICAs), rather than by tariffs.

LEC. Plaintiffs allege that, in either scenario, defendants improperly deliver interexchange calls to their local exchange facilities in order to avoid paying terminating access charges.

Plaintiffs filed this action in reliance upon an order issued by the FCC on April 21, 2004. See In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges, 2004 WL 856557, 19 F.C.C.R. 7457 (Order April 21, 2004) (AT&T Access Charge Order). AT&T had argued that interexchange telephone calls transmitted in IP format were not a telecommunications service but, rather, an enhanced service exempt from terminating access charges.

The FCC rejected AT&T's argument. It determined that access charges are due for long distance traffic "which an end-user customer originates by placing a call using a traditional touch-tone telephone with 1+ dialing, utilizes . . . IP transport, and is converted back from IP format before being terminated at a LEC switch." Id. at ¶ 24. Access charges are due whether the interexchange carrier provides its own IP voice services or contracts with another provider to do so. Id. at ¶ 18. Furthermore, when a provider of IP-enabled services contracts with an interexchange carrier to deliver long distance calls, the interexchange carrier is obligated to pay terminating access charges. Id. at ¶ 19. This rule applies "regardless of whether only one interexchange carrier uses IP transport or instead multiple service providers are involved in providing IP transport." Id.

The FCC noted that it had recently adopted a Notice of Proposed Rulemaking concerning IP-enabled services. Id. at ¶ 2. The Notice was released on March 10, 2004. In the Matter of IP-Enabled Services, FCC No. 04-28, 2004 WL 439260, 19 F.C.C.R. 4863 (Notice of Proposed Rulemaking, March 10, 2004. Among the issues upon which the FCC sought comment are (1) "the extent to which access charges should apply to [Voice over Internet Protocol] VoIP and other IP-enabled services," and (2) how to classify the providers of these services. Id. at ¶ 61. During the pendency of the rulemaking proceedings, however, there was "significant evidence that similarly situated carriers may be interpreting [the] current rules differently" with "significant implications for competition." AT&T Access Charge Order at ¶ 2. The FCC issued the AT&T Access Charge Order to provide clarity to the industry pending the outcome of comprehensive rulemaking proceedings. Id.

## II. Discussion

Global Crossing argues that plaintiffs' tariffs establish that only "customers" are liable for terminating access charges and that Global Crossing is not a customer because it does not "subscribe" to plaintiffs' services. Global Crossing further argues that the AT&T Access Charge Order does not obligate it to pay terminating access charges because Global Crossing is not the entity that delivers long distance traffic to the LECs. Global Crossing also argues that all liability arising before December 9, 2003, was discharged by the bankruptcy reorganization plan.

### A. Access Charges and Primary Jurisdiction

Regulated telecommunications companies involved in interstate commerce are treated as "common carriers" under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq*. American Tel. & Tel. Co. v. Central Office Tele., Inc., 524 U.S. 214, 216 (1998). Section 203 of the Communications Act requires common carriers to file "schedules," also known as "tariffs," containing all of their "charges" for interstate services and all "classification, practices and regulations affecting such charges." Id. at 217 (citing § 203). Once the FCC approves the rates that a carrier charges its customers, the rates become the law and exclusively govern the rights or liabilities of the carrier to the customer. Hill v. BellSouth Telecomms., Inc., 364 F.3d 1308, 1315 (11th Cir. 2004). The parties may not make separate agreements that vary from the terms contained in the tariff. "Thus, even if a carrier intentionally misrepresents its rate and a customer relies on its misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." AT&T, 524 U.S. at 222.

Plaintiffs' tariffs apply only to "customers." In turn, the tariffs define a "customer" as any entity that "subscribes" to plaintiffs' services. Defendant Global Crossing asserts, and plaintiffs do not dispute, that it does not subscribe to plaintiffs' services and thus is not a customer under the tariffs.

Plaintiffs contend that defendant Global Crossing is a "customer" under the "constructive ordering" doctrine. The doctrine establishes that a "party 'orders' a carrier's services when the receiver of services (1) is interconnected in such a

manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such access services." Advamtel, LLC v. AT&T Corp., 118 F.Supp.2d 680, 684 (E.D. Va. 2000). In Advamtel, AT&T refused to pay access charges even though it received originating and terminating access service directly from the plaintiff CLECs. The "constructive ordering" doctrine was successfully invoked to counter AT&T's contention that it was not a customer because it had not completed the ordering forms specified by the plaintiffs' tariffs. Id. at 684-85.

Global Crossing argues that, contrary to the facts in Advamtel, there is no direct connection between itself and the terminating LECs. Plaintiffs counter that the FCC conclusively ruled on this matter in the AT&T Access Charge Order when it stated that interexchange carriers are liable for terminating access charges "whether only one interexchange carrier uses IP transport or instead multiple service providers are involved in providing IP transport." AT&T Access Charge Order at ¶ 19. The AT&T Access Charge Order is not wholly on point, however, in that AT&T appears to have been the entity in direct connection with the terminating LECs.

Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making. Access Telecommunications v. Southwestern Bell Telephone Co., 137 F.3d 605, 608 (8th Cir. 1998). The doctrine "applies where enforcement of a claim originally cognizable in a court requires the resolution

-7-

of issues which, under a regulatory scheme, have been placed within the special expertise and competence of an administrative agency." Southwestern Bell Telephone Co. v. Allnet Comm. Servs., Inc., 789 F. Supp. 302, 304 (E.D. Mo. 1992). The purposes of the doctrine are to: (1) ensure desirable uniformity in determinations of certain administrative questions, and (2) promote resort to agency experience and expertise where the court is presented with a question outside its conventional expertise. United States v. Western Pac. R. Co., 352 U.S. 59, 63-64 (1956).

The present action is one of four that the Court has found in which LECs seek payment of access charges in reliance upon the AT&T Access Charge Order. In each of the other three, as discussed below, the courts stayed the action pursuant to the doctrine of primary jurisdiction.

In Frontier Telephone of Rochester, Inc. v. USA Datanet Corp., 386 F.Supp.2d 144 (W.D.N.Y. 2005) the plaintiff LEC sought "originating access charges" from VoIP long-distance provider Datanet.[6] The Frontier court stayed the action pending determination by the FCC regarding the applicability of access charges to VoIP. Id. at 151. The court first noted that Datanet asserted that its VoIP service provided "enhanced functionality" that distinguished it from the services addressed by the AT&T Access Charge Order. Id. at 149-50. Determining whether the

---

[6]Like defendant Global Crossing in this matter, Datanet argued it was not liable for access charges because it was not directly connected to the LEC but, rather, received phone calls for transmission from an intervening CLEC. Id. at 145-46.

-8-

Datanet service indeed provided enhanced functionality "involves technical and policy considerations that are particularly within the expertise of the FCC." Id. at 150. In addition, the Datanet service used a different dialing method than that addressed by the AT&T Access Charge Order. Id. While the court "suspect[ed]" that the FCC would find the distinction irrelevant and would require Datanet to pay access charges, the "fact remains that Datanet's dialing system is different from AT&T's." Id. at 150 and at 150 n.4. Finally, the Court noted that the FCC was engaged in rulemaking procedures regarding the extent to which VoIP providers should pay access charges. Id. at 150-51.

Plaintiffs brought a related case in this Court that was also stayed pursuant to the primary jurisdiction doctrine. In Southwestern Bell Telephone, L.P. v. VarTec Telecom, Inc., plaintiffs sought terminating access charges from interexchange carrier VarTec and LCRs UniPoint and Transcom. The action was stayed with regard to VarTec because it was in bankruptcy proceedings. The LCR defendants moved to dismiss, arguing that the AT&T Access Charge Order only applied to interexchange carriers. The Court found that resolution of plaintiffs' claims against the LCRs would require it to determine either that the LCRs were interexchange carriers or that access charges could be assessed against entities other than interexchange carriers. Southwestern Bell Telephone, L.P. v. VarTec Telecom, Inc., No. 4:04-CV-1303, 2005 WL 2033416 at *4 (E.D. Mo. Aug. 23, 2005). The Court found that "entrance into these determinations would create a risk of

inconsistent results among courts and with the [FCC].  The FCC's ongoing Rulemaking proceedings concerning VoIP and other IP-enabled services make deferral particularly appropriate in this instance."  Id.

In The Southern New England Telephone Company v. Global Naps, Inc., No. Civ.A. 304CV2075JCH, 2005 WL 2789323 (D. Conn. Oct. 26, 2005), plaintiff LEC alleged that defendant "misrouted" long distance telephone traffic to avoid Group D trunk facilities.[7]  Some, but not all, of the calls were transmitted using IP format.  Id. at *2.  Citing Frontier and Southwestern Bell, and noting the proceedings pending before the FCC, the court stayed plaintiff's "misrouting" claims involving IP-format.  Id. at *6.

Two other related matters are before the FCC: Southwestern Bell Telephone seeks a declaratory ruling that wholesale transmission providers using IP technology are liable for access charges.  Petition of SBC ILECs for a Declaratory Ruling That UniPoint Enhanced Services, Inc. d/b/a PointOne and Other Wholesale Transmission Providers Are Liable for Access Charges (filed Sept. 21, 2005).  In addition, VarTec filed a petition for a declaratory ruling that it is not liable to pay terminating access charges when other carriers deliver calls to the LECs for termination.  Petition for Declaratory Ruling That VarTec Telecom, Inc., Is Not Required

---

[7]Plaintiff alleged that Global Naps delivered long distance traffic to "meet point trunks" which, under the parties' agreement were reserved for the delivery of interexchange traffic to Global Naps's own customers and were not to be used, as alleged, for delivery of interexchange traffic to plaintiff's customers.  Id. at *2.

<u>To Pay Access Charges To Southwestern Bell Telephone Company or Other Terminating Local Exchange Carriers When Enhanced Service Providers or Other Carriers Deliver the Calls to Southwestern Bell Telephone Company or Other Local Exchange Carriers for Termination</u> (filed Aug. 20, 2004). Based upon the record before the Court, it appears that VarTec and Global Crossing play similar roles in the transmission of IP-enabled long distance calls. The FCC's ruling on the VarTec petition, thus, will be directly applicable to the present dispute.

Neither party in the present action has asked the Court to apply the primary jurisdiction doctrine. The Court may, however, invoke the doctrine *sua sponte*. <u>Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.</u>, 307 F.3d 775, 780 n. 2 (9th Cir. 2002); <u>Williams Pipe Line Co. v. Empire Gas Corp.</u>, 76 F.3d 1491, 1496 (10th Cir. 1996); <u>Global Naps, Inc. v. Bell Atlantic-New Jersey, Inc.</u>, 287 F. Supp.2d 532, 547-48 (D.N.J. 2003). The present action involves questions under consideration by the FCC, such as whether an interexchange carrier may be liable for access charges when it does not interconnect with the LEC and how the liability for access charges is to be allocated among the various participants. There is plainly a risk of inconsistent rulings with regard to each of these questions. Accordingly, the Court will stay consideration of plaintiffs' access charge claims pending determination by the FCC of the obligations of the participants in the transmission of long distance telephone calls using IP format. The Court will also stay consideration of plaintiffs' state law claims.

## B. The Bankruptcy Reorganization Plan

Defendant Global Crossing also argues that the Court should dismiss, pursuant to Rule 12(b)(1) or Rule 12(b)(6), all claims arising before December 9, 2003, the date on which it emerged from bankruptcy proceedings. On December 4, 2003, the Bankruptcy Court for the Southern District of New York entered a Plan of Reorganization under which "New GCL" became the owner of the assets of "Old GCL." In re Global Crossing Ltd., No. 02-40188 (REG) (Order Dec. 4, 2003). The Plan enjoins all persons from prosecuting against New GCL and its reorganized subsidiaries any claim that arose before December 9, 2003. § 9.5. The Plan provides that, "In no event, shall . . . New Global Crossing and the Reorganized Successor Debtors have any liability or obligation for any Claim against . . . any of the Debtors arising prior to [December 9, 2003], other than the Assumed Liabilities." Id. The "Assumed Liabilities" include "Administrative Expense Claims," § 1.8, which include the costs of preserving the estate and running the debtor business, § 1.3. Plaintiffs do not contend that their claims fall within the definition of Assumed Liabilities. As defendant notes, under 11 U.S.C. § 1141(d)(1)(A), "Except as otherwise provided . . . in the plan, or in the order confirming the plan, the confirmation of a plan – discharges the debtor from any debt that arose before the date of such confirmation."

Plaintiffs rely on 11 U.S.C. § 523 to assert that their claims survive the discharge. Section 523(a)(2)(A) provides that, "A discharge under . . . 1141 . . . does not discharge any individual

-12-

debtor from any debt . . . for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud." (emphasis added). The Eighth Circuit has held that § 523 applies only to an individual debtor and not a corporate debtor. Yamaha Motor Corp USA v. Shadco, Inc., 762 F.2d 668, 670 (8th Cir. 1985).

Plaintiffs also assert that a confirmed plan that purports to enjoin suits is unenforceable where the entities involved are unaware of their claims, "such as a tort claimant whose injuries have not yet manifested." The parties all submitted comments to the FCC in the course of AT&T proceedings. As plaintiffs acknowledge, defendant Global Crossing submitted its comments on December 18, 2002. Thus, plaintiffs were aware of defendant's role in IP telephony before the confirmation order was entered on December 4, 2003. The Court concludes that plaintiffs' claims arising before December 9, 2003, are barred by the Reorganization Plan entered by the Bankruptcy Court for the Southern District of New York.

### C. The Settlement Agreement

In the course of the bankruptcy proceedings, Old GCL and the plaintiffs in this action signed a settlement agreement, approved by the bankruptcy court on March 24, 2003, and effective April 3, 2003. The agreement contained a broad release by the SBC entities in favor of the Global Crossing entities and their successors and assigns, releasing:

> all . . . rights or damages under any legal theory . . . which they now have, may claim to have or ever had, whether such Claims are currently known, unknown, foreseen, or unforeseen,

-13-

>    which any of the SBC Releasors may now have or have ever had,
>    from the beginning of time through and including the date of
>    this Settlement Agreement; <u>provided, however</u>, that the
>    foregoing release shall not affect . . . (ii) any obligations
>    incurred by [Global Crossing] for the purchase of services
>    from the SBC Entities since the petition date.

Settlement Agreement § 4.5.

Global Crossing contends that the release bars plaintiffs' claims arising before April 3, 2003. Plaintiffs counter that Global Crossing "constructively ordered" services and that such constructive ordering amounts to a purchase within the meaning of the release. This would appear to be a strained meaning of "purchase." However, the proceedings before the FCC may have some bearing on this issue and the Court will defer consideration of the effect of the settlement agreement until the stay is lifted.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of the Global Crossing defendants to dismiss [#55] is **granted** with respect to claims arising before December 9, 2003 and **denied without prejudice** in all other respects.

**IT IS FURTHER ORDERED** that the motion of the McLeod and the Xspedius defendants to dismiss [#68] is **denied without prejudice**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to strike notice inadvertently filed in the wrong case [#79] is **granted**.

**IT IS FURTHER ORDERED** that this matter is **stayed** pending determination by the Federal Communications Commission of the applicability of access charges to providers of IP enabled telephony.

**IT IS FURTHER ORDERED** that plaintiffs shall file a status report within six months of the date of this order or upon determination by the Federal Communications Commission of the issues relevant to this action, whichever is earlier.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 7th day of February, 2006.